# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 4, 2014

## STATE OF TENNESSEE v. ASHLEY WHEELER

**Appeal from the Criminal Court for Shelby County**
**No. 1200990    James M. Lammey, Judge**

_____

**No. W2013-02765-CCA-R3-CD  - Filed March 11, 2015**

_____

Defendant, Ashley Wheeler, was indicted by the Shelby County Grand Jury for two counts of forgery valued at $1,000 or more, but less than $10,000, in Counts 1 and 2.  In Count 3, Defendant was indicted for attempted theft of property valued at $1,000 or more, but less than $10,000.  Following a jury trial, Defendant was convicted as charged.  Following a sentencing hearing, the trial court merged Count 1 with Count 2 and sentenced Defendant to two years for her forgery conviction and one year for her attempted theft conviction.  The trial court ordered Defendant's sentences to be served concurrently and suspended on probation.  In this appeal as of right, Defendant asserts that: 1) the prosecutor committed prosecutorial misconduct by making improper comments during closing argument; 2) the evidence was insufficient to support her convictions; and 3) the trial court abused its discretion by denying her requests to be granted judicial diversion and to be sentenced as an especially mitigated offender.  Having carefully reviewed the record before us, we conclude that the comments of the prosecutor during closing argument constitute prosecutorial misconduct rising to the level of plain error.  We therefore reverse the judgments of the trial court and remand this case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Reversed and Remanded for New Trial**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Stephen Bush, District Public Defender; Jennifer Mitchell, and Phyllis Aluko, Assistant Public Defenders, Memphis, Tennessee, for the appellant, Ashley Wheeler.

Herbert H. Slatery, III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Bryce Phillips, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Trial*

On July 13, 2011, Memphis Police Officer Lenayan Holmes responded to a "forgery theft call" at Speedy's Check Cashing in Memphis. When Officer Holmes arrived, the owner of the business, James Briggs, informed him that a person, whom Mr. Briggs later identified as Defendant, had attempted to cash a stolen check. Defendant had already left when Officer Holmes arrived.

James Briggs, the owner of Speedy's Check Cashing, testified that on July 13, 2011, Defendant presented a check in the amount of $2,800 to be cashed. Mr. Briggs looked at the back of the check, and it was not endorsed. Defendant endorsed the check and presented her driver's license for identification. Mr. Briggs had never seen Defendant in the store before, and he believed the amount of the check was a "red flag." He called the purported maker of the check, Endocrinology and Diabetes Association in Nashville, in order to verify the check. Mr. Briggs spoke to the office manager and discovered that the check was forged. The office manager contacted the police, and Mr. Briggs remained on the phone to "keep the rouse" hoping that the police would arrive while Defendant was still there. Mr. Briggs testified that he stood across from Defendant for 15 to 20 minutes. A bullet-proof glass window separated Mr. Briggs from Defendant. He got a "good look" at Defendant and he was sure that the photo on the driver's license matched the person trying to cash the check. Mr. Briggs subsequently identified Defendant in a photographic lineup and at trial. Defendant left before police arrived, and she left the check and her driver's license at Speedy's Check Cashing.

Myriam Bagwell testified that she was the Practice Administrator at Endocrinology Diabetes Association in Nashville. Her duties included payroll, and she testified that she was the only person with authority to prepare checks. She testified that Mr. Briggs called her to ask about the subject check, and she recognized the check number as one in a sequence of 70 checks that had been stolen from the business over the July 4, 2011 weekend. Mr. Briggs told her the name of the person to whom the check was made out, and she had "never heard of that person." Ms. Bagwell testified that she did not sign the check. She testified that the font used on the check was "not our font that we use." She also testified that when she issues a check, the check number is printed in a different location on the check than the location where it is printed by the bank printer, and this check did not have such printing.

-2-

Sergeant Fred Farah, of the Memphis Police Department, compiled a six-person photographic lineup for Mr. Briggs to view. Sergeant Farah testified that he included in the photo lineup a different photograph of Defendant than the photograph on the driver's license that Defendant left at the scene. Sergeant Farah testified that Mr. Briggs positively identified Defendant in the photo lineup. Sergeant Farah testified that he had been investigating economic crimes for four years, and it was not uncommon for a suspect to use his or her own identification when attempting to cash a forged or stolen check, nor was it uncommon for a suspect to claim that his or her license had been stolen prior to the offense for which the suspect was charged.

Defendant testified that she was 20 years old in July, 2011. In April, 2011, she and her friend Shanice Shepard left the James Lounge Club and discovered that Ms. Shepard's car window had been "busted," and Defendant's purse, which contained her driver's license, social security card, and $20 cash, had been stolen from the trunk. Defendant testified that she had been allowed entry into the club without her identification. She testified, "[t]hey pretty much let anybody in there." Defendant testified that she and Ms. Shepard did not report the burglary to the police because they were intoxicated, but they reported it to someone inside the club. Defendant testified that she "thought if [she] reported it to the DMV and the Social Security Office that [she] was going to be okay." She applied for a replacement driver's license and social security card. Defendant acknowledged that she had applied for and received several replacement driver's licenses since receiving her first driver's license in 2009 at the age of 18. She testified that she was "always misplacing [her] I.D. and [her] Social Security card." She testified that she received a replacement license in January, 2010, after losing her original license. She misplaced this replacement license and received another replacement license in June, 2010. Defendant could not remember the circumstances under which she lost either of those two licenses. She testified that she was "irresponsible" and that she "laid around information that [she] wasn't supposed to lay around." Defendant received another replacement license in May, 2011, after her purse and license were stolen from Ms. Shepard's vehicle. She received another license in February, 2013, after her driving privileges were reinstated after having been suspended due to unpaid citations.

Defendant testified that she was "shocked [and] distraught" when she was arrested at her residence in August, 2011. Defendant testified that she had never before heard of Speedy's Check Cashing or Endocrinology Diabetes Association. She denied that she forged a check from Endocrinology Diabetes Association and that she attempted to cash a check at Speedy Cash. On cross-examination, Defendant also testified that she was at home with her mother all day on July 13, 2011.

Shanice Shepard testified that her keys and Defendant's purse were stolen from her vehicle while they were inside the James Lounge Club. Ms. Shepard left her identification at home that night. She testified that it was a "no I.D. club" and that she purchased alcohol without identification. She testified that she "wasn't drunk at all" and that she did not see Defendant consume any alcohol that night. She did not report the burglary because she "wasn't thinking about calling the police at the time." She testified that she and Defendant did not go back inside the club to tell anyone about the burglary.

Joann Tabor, Defendant's mother, testified that she told Defendant to report to the police the incident in which Defendant's purse was stolen, but Defendant instead reported it to the "driver license people." Ms. Tabor had taken Defendant "several times to get a replacement" driver's license and said that Defendant was "very clumsy with a purse."

***Sentencing hearing***

Defendant testified that she was 22 years old at the time of the hearing and was employed at Volunteers of America, where she provided care for disabled people. Defendant graduated from high school in May, 2010. Defendant testified that she had a three-year-old daughter, and she and her daughter lived with Defendant's mother and sister. Defendant denied that she had any involvement in the checks having been stolen from Endocrinology Diabetes Association in Nashville and denied that she attempted to cash a forged or stolen check. Defendant acknowledged that she had a juvenile record and testified that she had stolen "[l]ittle stuff," including pajamas and underwear. Defendant testified,

> I feel like I deserve [judicial] diversion because, you know, I am a good person; and I did change my life. When I was young, I really made a complete turn and changed my life; and I just think I really deserve that because, you know, I didn't do this; and I just feel like diversion would be good for me; and then I can, you know, pursue all of my life and go to college and be successful in life.

Considering the relevant statutory factors in Tennessee Code Annotated section 40-35-313, the trial court denied Defendant's request for judicial diversion. The trial court found that Defendant was amenable to correction. Considering the circumstances of the offense, the trial court found that the offense neither caused nor threatened serious bodily injury, but that it was "a crime of dishonesty." The trial court noted that it was Mr. Briggs' job "to cash checks . . . and he knew that if he cashed a check that was bad that he would be the one that was holding the bag; and he could be responsible for it, and basically he would be the one that would suffer a loss." The court found that "it only stands to reason that he [would] be paying very close attention" to a person attempting to cash a check written for

-4-

such a large amount. The court stated, "[s]o, I find it highly unlikely that he was mistaken in his identity of her." The court also commented on Defendant's credibility, stating, "I just don't believe her testimony. I don't believe she was not involved in [the crime]."

The trial court noted that there was nothing in the record to show "how pervasive or unpervasive [sic] the crime of forgery is in our community." The trial court also considered Defendant's criminal record and social history, finding that she had committed other crimes of dishonesty as a juvenile, and the court noted that Defendant "like[d] to partake in [marijuana], which is still illegal in this state," and had tested positive for the drug on multiple occasions. In the presentence report, Defendant reported that she started using marijuana almost every day from age 19 until she was 21 years old in 2012. The court observed that Defendant "wast[ed] resources that could be used in alternative ways, i.e., taking care of your child that you have rather than spending money on [marijuana] . . . ." The trial court concluded that judicial diversion would not serve the interests of the public or Defendant.

In sentencing Defendant, the trial court found no applicable enhancement factors. The trial court found that "there was no need to give her any more than the minimum" sentence of two years for her Class D felony forgery conviction and one year for her attempted theft conviction. The court also found that Defendant was eligible for probation and sentenced Defendant to a total effective sentence of two years, suspended on probation.

*Analysis*

*Prosecutorial misconduct*

Defendant contends that the State engaged in prosecutorial misconduct during its closing arguments. Specifically, Defendant asserts that the prosecutor "vouched for the credibility of its only eyewitness, argued facts outside of the record, argued misleading facts, and asserted that the defense was engaged in an intentional strategy to confuse the jurors." The State contends that Defendant has waived this issue because she failed to make a contemporaneous objection to the prosecutor's closing arguments at trial, and Defendant failed to raise this issue in her motion for new trial. *See* Tenn. R. App. P. 36(a) ("[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). Defendant asserts, however, that the issue is reviewable under a plain error analysis. The State responds that Defendant has failed to establish that the prosecutor's comments amounted to plain error.

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." *See also* Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

a) the record must clearly establish what occurred in the trial court;
b) a clear and unequivocal rule of law must have been breached;
c) a substantial right of the accused must have been adversely affected;
d) the accused did not waive the issue for tactical reasons; and
e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Smith*, 24 S.W.3d at 283. Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (internal quotations omitted).

Initially, we note that the record clearly establishes what occurred in the trial court. The parties' closing arguments are transcribed and included in the appellate record. The State asserts that Defendant has failed to establish that a clear and unequivocal rule of law was breached. It is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In *Goltz*, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument:

(1)     intentionally misleading or misstating the evidence;
(2)     expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;
(3)     making statements calculated to inflame the passions or prejudices of the jury;

> (4)     injecting broader issues than the guilt or innocence of the
>           accused; and
> (5)     intentionally referring to or arguing facts outside the record that are not
>           matters of common public knowledge.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In connection with this issue, we must examine the following factors:

> (1)     the conduct complained of viewed in context and in light of
>           the facts and circumstances of the case[;]
> (2)     the curative measures undertaken by the court and the
>           prosecution[;]
> (3)     the intent of the prosecutor in making the statement[;]
> (4)     the cumulative effect of the improper conduct and any other
>           errors in the record[; and]
> (5)     the relative strength or weakness of the case.

*Id*. (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Defendant complains of the following instances of alleged prosecutorial misconduct. During the State's closing argument, the prosecutor remarked that Mr. Briggs "was a good and truth-telling witness." The prosecutor also commented on the veracity of Sergeant Farah's testimony when he stated, "I submit [Sergeant Farah's testimony] was truthful . . . ." The prosecutor also argued during the State's rebuttal, "[t]hat's first and foremost in the state's case, and that is the crux of our case – identification – it is a good identification."

Defendant asserts that the prosecutor argued facts that were outside of the trial record when he told the jury that Mr. Briggs "doesn't get anything out of it; in fact, he had to pay to park just like you guys." Defendant asserts that the prosecutor again argued facts outside of the record when he commented, "more than likely when [Defendant] cashed a check, she would have gotten some percentage of that twenty-eight hundred dollars and shared it with whoever drove her off or another party outside of that . . . ." Defendant contends that the prosecutor acknowledged the impropriety of his comments when he told the jury, "[w]e can't go outside the record." The prosecutor also told the jury, "[t]hose checks got passed all over kingdom come. [Defendant] was one of many recipients. You didn't hear all the proof of that. You couldn't have heard all the proof of that but that's still an on-going investigation; and, again, that's not something you need to worry about – not for her guilt or innocence."

-7-

Defendant also asserts that the prosecutor misled the jury by commenting on defense counsel's failure to question Defendant's mother about Defendant's alibi. Defendant argues that the prosecutor's comments were misleading because defense counsel had already explained to the trial court and the prosecutor that it did not intend to question Defendant's mother about an alibi. Defendant states that defense counsel's decision not to assert an alibi defense was a "tactical" decision made because defense counsel could not verify Defendant's alibi. Defendant testified on cross-examination by the State that she was home all day on the date of the offense. Upon further questioning by the State, Defendant testified that her mother could also testify that Defendant was home all day on the date of the offense. During a bench conference following this testimony by Defendant, defense counsel informed the trial court and the prosecutor that she did not intend to present evidence of an alibi. The prosecutor expressed his surprise and frustration that Defendant had answered his direct question, "Any other witnesses [in addition to her three-year-old child] can put you [at your home on the date of the offense]" by saying, "Yes, my mother." The prosecution immediately asked for a bench conference to inform the trial court he had not received notice of an alibi defense. During the bench conference, the prosecutor candidly stated, "I certainly wouldn't have asked the question if I had known that would be the answer." The prosecutor clearly objected to any testimony from Defendant's mother which would provide an alibi for Defendant due to the lack of notice of intent to use an alibi. Conversely, Defendant's counsel clearly stated during the bench conference that she had never intended to elicit alibi proof during the testimony of Defendant's mother. Thus, both parties made representations to the trial court that it would be totally improper to elicit alibi testimony from Defendant's mother. Defendant's mother testified after Defendant had testified, and no alibi testimony was included.

Defendant argues that it was therefore improper for the State to suggest in closing arguments that defense counsel's failure to ask Ms. Tabor about the alibi was indicative of Defendant's lack of credibility. During the State's rebuttal closing argument, the prosecutor stated,

> . . . . and then suddenly it dawned on her, "Hey, I need an alibi, so I'm going to throw in my mama was there with me." But you heard her mother testify; she did not say a word about being home with her daughter that day? – don't you think that would have been more important than, "Hey, I saw some broken-out glass?" You know why? – because her mother would not lie for her.

In analyzing whether a clear and unequivocal rule of law was breached in this case, we first determine that the prosecutor's comments are examples of prosecutorial misconduct as outlined in *Goltz*. In his closing arguments to the jury, the prosecutor expressed his

personal belief as to the truth of two of the State's witnesses. Also, the prosecutor's comments regarding defense counsel's failure to question Defendant's mother about Defendant's "alibi" was misleading to the jury in light of the facts and circumstances of this case, when the issue had been the subject of an extensive bench conference. We conclude that two of the five areas of prosecutorial misconduct during closing argument occurred in this case: (1) intentionally misleading the jury about the lack of alibi testimony from Defendant's mother, especially when the State elicited testimony from Defendant which caused the issue to arise, and (2) repeatedly expressing his opinion as to the truth of the testimony of witnesses called by the State. *See Goltz*, 111 S.W.3d at 6.

It is worth quoting the specific examples of the prosecutor's giving an opinion as to the truth or falsity of a witness's testimony or other evidence:

(a)    "James Briggs, the owner/proprietor of Speedy's Check Cashing. . . . You heard from Mr. Briggs on the witness stand. He came in. I submit to you, *he was a very good witness*. . . . He had to come to multiple hearings. He had to come down first and identify the defendant [in] that six-person photo lineup. So, I submit to you, he doesn't have a motive to lie. . . . If you look at all the other factors, some of which don't apply one way or the other, but *anywhere James Briggs is concerned, I submit to you was a good and truth-telling witness*."

(b)    While reminding the jurors that during Mr. Briggs' testimony, he (the prosecutor) placed himself in the courtroom to demonstrate how close Defendant was to Mr. Briggs, the prosecutor argued, "if you recall, as I walked up to him, I got pretty close, he [Mr. Briggs] said, actually, 'Back up a step.' *So, he was very truth-telling in that*."

(c)    "Sergeant Farah also said, under cross-examination, the reason he didn't go further is because he didn't have enough information. *He testified, and I submit it was truthful*, he did not have probable cause to arrest any other potential occupants at that time of any gray or silver Dodge Charger or Challenger."

(d)    "[T]he defendant intended to defraud, what else would she be there for? She was given a forged instrument to try to get money; so, certainly, I submit to you the state met our burden there if you believe it was the defendant, *as I say it is*."

(e) "Shanice Shepard said, 'We parted ways. I didn't buy her a drink. In fact, Shanice Shepard was surprised the defendant would even say she had drinks that night because, again, *one or both of them is lying. They may both be lying*."

(f) While discussing inconsistent testimony of Defendant and her witness Shanice Shepard as to whether they notified security at the nightclub about the burglarized vehicle, the prosecutor argued, "*So, one or both of them was lying here, and I submit to you it was the defendant*."

As to the *Pulliam* factors,

(1) Viewed in context and in light of the facts and circumstances of the case, we note that the prosecutor clearly set forth that the only issue in the trial was the identity of the perpetrator. There was no evidence of surveillance tapes to identify Defendant. Defendant's identification, a driver's license, was left at the scene and she explained it had previously been stolen from her. Defendant testified that she did not commit the offense. Mr. Briggs testified that he identified Defendant from what he saw during the commission of the offense and his identification of her was done in a photo spread and during trial. Critical to the jury's decision in this case was witness credibility. The prosecutor twice referred to Defendant as a liar. The prosecutor vouched for the truthful testimony of two State's witnesses multiple times. The prosecutor told the jury the State had met its burden of proof if the jury believed the perpetrator was Defendant, "as I say it is." This factor weighs heavily against the State.

(2) No curative measures were undertaken by the court. This weighs against the State.

(3) Due to the multiple instances of prosecutorial misconduct that occurred during a relatively short closing argument (approximately 21 pages of transcript), as opposed to being only one or two instances of improper argument in a lengthy argument, it tends to show that the prosecutor's intent was to strongly influence the jury's decision making with the improper argument, and this weighs against the State.

(4) We find no other errors in the record. Therefore, the cumulative effect with other errors is lacking, and this weighs in favor of the State.

(5)     We have extensively summarized in detail the evidence at trial, and our conclusion is that the State's proof, while not "overwhelming," was relatively strong. This weighs in favor of the State.

After carefully considering all of these factors, we are compelled to conclude that we must grant relief pursuant to "plain error" and that the prosecutorial misconduct, due to its serious and blatant nature, is reversible error.

In support of this conclusion we examine the *Adkisson* factors. We have noted that the record clearly establishes what occurred in the trial court. The repeated instances of improper closing argument was a breach of the clear and unequivocal rule of law regarding improper closing argument by a prosecutor. This violated the substantial right of Defendant to a fair trial. Even after a diligent search in the record, we are unable to conclude that there would be any logical, conceivable, or tactical reason to fail to object to all of the instances of improper argument by the prosecutor. Finally, our consideration of these errors is absolutely necessary to do substantial justice. The *Goltz* opinion, setting forth the "five general areas of prosecutorial misconduct," was filed and published over eleven years ago. It is clearly time for recognition, acceptance, and honoring of these five areas of prohibited argument.

For these reasons, the convictions must be reversed and the case remanded for a new trial. We will address the remaining issues in the event of future appellate review or for purposes of guidance to the trial court on remand.

*Sufficiency of the evidence*

Defendant challenges the sufficiency of the evidence to sustain her convictions for forgery and attempted theft of property. Specifically, Defendant contends that the evidence was insufficient to establish her identity as the perpetrator of the offenses. We note that if Defendant is entitled to relief on this issue, her convictions would have to be reversed and dismissed rather than reversed and remanded for a new trial. Thus, it is not legally inconsistent to reverse a conviction and remand for a new trial when a defendant is denied a fair trial, and at the same time conclude that the evidence introduced at trial was legally sufficient to support the convictions had the defendant received a fair trial.

We begin by recognizing that the State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (citing *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the

-11-

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)).

The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id*.

The identity of the accused as the person who committed the offense for which she is on trial is a question of fact for the jury. *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). The identity of an accused may be established either by direct evidence, circumstantial evidence, or a combination of the two. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999).

A person commits forgery who "forges a writing with intent to defraud or harm another." T.C.A. § 39-14-114(a). "Forge" means to:

> (b)(1)(A) Alter, make, complete, execute or authenticate any writing so that it purports to:
>
> > (i)  Be the act of another who did not authorize that act;

. . .

(C)    . . . utter a writing that is forged within the meaning of
        subdivision (b)(1)(A)[.]

T.C.A. § 39-14-114(b)(1). "A forged check is uttered or transferred by the action of presenting it for payment." *State v. McDowell*, 664 S.W.2d 310, 313 (Tenn. Crim. App. 1983) (citing *Girdley v. State*, 29 S.W.2d 255 (Tenn. 1930)).

A person commits theft of property who, with intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's consent. T.C.A. § 39-14-103(a). A person attempts to commit theft of property when she "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as [he] believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." *Id*. § 39-12-101(a)(3).

We first observe that it was error for the trial court to merge the two offenses of forgery in Counts 1 and 2. At the sentencing hearing, the trial court merged Counts 1 and 2, explaining that the offenses were two alternate theories of forgery. However, we conclude that the offenses in Counts 1 and 2 are two separate and distinct offenses of forgery, with two different victims, which are both supported by the evidence, as explained below. Count 1 of the indictment alleged that Defendant "did unlawfully, knowingly, and with the intent to defraud Endocrinology Diabetes Association . . . *forge and make* a certain paper writing . . . [copy of check made payable to Defendant] so that the said paper writing purported to bear a signature not authorized as drawer, in violation of T.C.A. [§] 39-14-114. . . ." (Emphasis added). Count 2 of the indictment alleged that Defendant "did unlawfully, unknowingly, and with the intent to defraud Speedy's [Check Cashing] . . . *utter* unto the said Speedy's a certain paper writing . . . [copy of check made payable to Defendant] so that the said paper writing purported to bear a signature not authorized as drawer, in violation of T.C.A. [§] 39-14-114. . . ." (Emphasis added).

Defendant argues that no evidence was presented that Defendant was the person who signed the check as the purported drawer, "James Hayes," as alleged in Count 1 of the indictment. The State, in its brief, fails to respond to this issue. We conclude that Defendant's conviction in Count 1 is supported by the circumstantial evidence. Defendant possessed a check that Ms. Bagwell testified was stolen and made without the authorization of Endocrinology Diabetes Association. The check was made payable to Defendant, and Defendant endorsed the check and presented it for payment. The check was dated July 8, 2011, four days after the check was stolen. The check was not authorized or signed by Ms. Bagwell, the only person authorized to issue checks from Endocrinology Diabetes

-13-

Association. The circumstantial evidence establishes that Defendant forged the check as alleged in Count 1 of the indictment, either as the principal actor or as one criminally responsible for the conduct of another. *See* T.C.A. § 39-11-402(2) (A person may be criminally responsible for an offense committed by the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]").

Defendant also argues that the evidence was insufficient to establish her identity as the person who entered the check cashing business and presented the check for payment. Defendant contends that Mr. Brigg's identification was not credible because Mr. Briggs' attention was diverted while Defendant was inside the store, and Mr. Brigg's photo identification of Defendant was influenced by having viewed the driver's license that was left behind.

Viewed in the light most favorable to the State, the evidence establishes that Defendant entered the store and attempted to cash the check. Mr. Briggs testified that he was able to get a good look at Defendant. He stood across from Defendant for 15 to 20 minutes separated only by a clear glass window. He examined the driver's license presented by Defendant and determined that the photo matched the person attempting to cash the check. Mr. Briggs testified that he identified Defendant in a photo lineup, and he testified that he was "one-hundred percent sure" Defendant was the person who entered the store and attempted to cash the check. The photo of Defendant used in the photo lineup was a different photo than the photo on the driver's license Defendant had presented to Mr. Briggs when she attempted to cash the check. We also note that Defendant's hairstyle in both photos is very different. Defendant testified that she had received several replacement driver's licenses. She testified that her driver's license was stolen outside of a club a few months prior to the offenses in this case. Defendant testified that she did not report the incident to police because she was intoxicated. There were conflicts in Defendant's and Shanice Shepard's testimony. Ms. Shepard testified that she and Defendant were not intoxicated and that they did not report the incident to police because they did not know they were supposed to do so. Ms. Shepard testified that they did not inform anyone inside the club about the incident. Defendant testified that they did report the incident to someone inside the club.

Based on the evidence presented at trial, a reasonable juror could have concluded that Defendant committed the offenses in this case. Defendant is not entitled to relief on this issue.

-14-

*Sentencing*

Defendant contends that the trial court erred by denying her request for judicial diversion. Tennessee Code Annotated section 40-35-313 outlines the requirements for judicial diversion. After a qualified defendant is either found guilty or pleads guilty, a trial court has the discretion to defer further proceedings and place that defendant on probation without entering a judgment of guilt. T.C.A. § 40-35-313(a)(1)(A). A qualified defendant is defined as a defendant who:

> (*a*) [i]s found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought;
>
> . . . .
>
> (*d*) [h]as not previously been convicted of a felony or a Class A misdemeanor for which a sentence of confinement is served; and
>
> (*e*) [h]as not previously been granted judicial diversion under this chapter or pretrial diversion.

T.C.A. § 40-35-313(a)(1)(B)(i).

Eligibility for judicial diversion does not entitle the defendant to judicial diversion as a matter of right. *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Rather, the statute states that a trial court "may" grant judicial diversion in appropriate cases. *See* T.C.A. § 40-35-313(a)(1)(A). When making a determination regarding judicial diversion, the trial court must consider the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's mental and physical health, (6) the deterrent effect of the sentencing decision to both the defendant and other similarly situated defendants, and (7) whether judicial diversion will serve the interests of the public as well as the defendant. *State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing *Parker*, 932 S.W.2d at 958). The record must reflect that the trial court considered and weighed all these factors in arriving at its decision. *Electroplating, Inc.*, 990 S.W.2d at 229 (citing *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by *State v. Hooper*, 29 S.W.3d 1, 9-10 (Tenn. 2000)).

Our supreme court in *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014), has concluded that the proper standard of review for judicial diversion decisions is that established in *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). The *King* Court explained,

[W]hen the trial court considers the *Parker* and *Electroplating* factors, specifically identifies the relevant factors, and places on the record its reasons for granting or denying judicial diversion, the appellate court must apply a presumption of reasonableness and uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision. Although the trial court is not required to recite all of the *Parker* and *Electroplating* factors in order to obtain the presumption of reasonableness, the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it. Thereafter, the trial court may proceed to solely address the relevant factors.

If, however the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard, which merely looks for "any substantial evidence" to support the trial court's decision, is not appropriate. . . . In those instances, appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration.

*King*, 432 S.W.3d at 328-29 (internal citations omitted) (footnote omitted).

It appears from the record that Defendant was eligible for judicial diversion. The record also reflects that the trial court considered and weighed all of the required factors in arriving at its decision. The trial court explained on the record why it denied Defendant's request for judicial diversion and explained why the circumstances of the offense outweighed the other factors and concluded that judicial diversion would not serve the interests of the public or Defendant. Accordingly, the trial court's decision is entitled to a presumption of reasonableness. Defendant is not entitled to relief on this issue.

Defendant also contends that the trial court erred by not sentencing her as an especially mitigated offender. Defendant argues that the trial court's decision should not be afforded a presumption of reasonableness because the trial court did not state on the record its considerations in sentencing Defendant as a standard offender. The State argues that the trial court's detailed analysis regarding the judicial diversion factors also constitutes consideration of the sentencing principles and relevant factors and that the trial court properly exercised its discretion in sentencing Defendant.

We review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness." *Bise*, 380

-16-

S.W.3d at 709 (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." *Id*. at 706. On appeal, the burden is on the defendant to show that the sentence is improper. T.C.A. § 40-35-401(d), Sentencing Comm'n Cmts. A trial court "may find" a defendant is an "especially mitigated offender" if (1) the defendant has no prior felony convictions; and (2) the court finds mitigating, but no enhancement factors. T.C.A. § 40-35-109(a) (2014). Upon such a finding, the trial court shall reduce either an especially mitigated offender's minimum sentence by ten percent, his release eligibility date by twenty percent, or both. T.C.A. § 40-35-109(b) (2014). Whether a defendant is an especially mitigated offender rests within the discretion of the trial court. T.C.A. § 40-35-109(a); *see State v. Braden*, 867 S.W.2d 750, 762 (Tenn. Crim. App. 1993).

Again, we conclude that the trial court's sentencing decision is entitled to a presumption of reasonableness because the record shows that the trial court properly considered the factors under T.C.A. § 40-35-210(b), including the trial and sentencing hearing evidence; the presentence report; the nature and characteristics of the criminal conduct involved; the evidence and information offered by the parties; the defendant's character and background; and the defendant's own statements regarding sentencing. The trial court did not find any applicable enhancement factors, stating, "I don't think there is anything to indicate that she should be enhanced." In considering the relevant judicial diversion factors, the trial court found that Defendant's conduct neither caused nor threatened serious bodily injury, which is also a mitigating factor. T.C.A. § 40-35-113(1). Although Defendant qualified for sentencing as an especially mitigated offender, the record shows that the trial court gave careful consideration to the circumstances of the offenses. The court found that Defendant's testimony was not credible. The trial court also found that Defendant had a history of offenses involving dishonesty and that she had used illegal substances. We conclude that the trial court did not abuse its discretion by not classifying Defendant as an especially mitigated offender. Defendant is not entitled to relief on this issue.

For the reasons stated herein, we reverse the judgments of the trial court and remand this case for a new trial.

_____
THOMAS T. WOODALL, PRESIDING JUDGE